417 A.2d 221

**COMMONWEALTH of Pennsylvania**

v.

**Thomas J. FLAHERTY, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 26, 1978.

Filed Dec. 19, 1979.

Petition for Allowance of Appeal Denied Aug. 29, 1980.

John H. Armstrong, Indiana, for appellant.

Walter S. Vuckovich, District Attorney, Indiana, for Commonwealth, appellee.

Before VAN der VOORT, SPAETH and MONTGOMERY, JJ.

SPAETH, Judge:

Appellant was convicted after a trial by jury of rape and burglary. On this appeal he argues that the evidence was insufficient to support his convictions; that his conviction of rape was against the weight of the evidence; and that the lower court erred in refusing to affirm a point for charge.

Appellant's argument that the evidence was insufficient for the jury to convict him of rape is frivolous. Appellant admitted at trial that he had sexual intercourse with the victim at the time and place charged in the indictment. Although appellant maintained that the victim consented to intercourse, the jury was entitled to believe the victim's

testimony that she did not consent.[1]  Whether the Commonwealth's evidence was sufficient to convict appellant of burglary, however, presents considerable problems.  Appellant argues that the evidence was insufficient to show that he entered the victim's dormitory room with the intent to commit a crime therein.  *See* 18 Pa.C.S.A. § 3502 (1973).  At most, appellant argues, the evidence showed that he formed the intent to rape the victim only *after* he entered the room.  For the reasons below, we also reject this argument.

-1-

When an appellate court holds that the evidence is insufficient to support a conviction, it says to those who were members of the jury: "We know that by announcing your verdict, you told the trial judge you had no reasonable doubt that the defendant had committed the crime.  But you were wrong.  You *should* have had a reasonable doubt."  This is the most serious intrusion into the trial process that an appellate court can make, for the result of it is that because of the prohibition against double jeopardy, the defendant must be ordered discharged and cannot be tried again.  *See Commonwealth v. Caye*, 465 Pa. 98, 384 A.2d 136 (1975); *Commonwealth v. Benaglio*, 254 Pa.Super. 100, 385 A.2d 544 (1978).

1.  We also reject appellant's argument that the jury's conclusion that the victim did not consent to sexual intercourse was contrary to the weight of the evidence.  The issue of the credibility of the victim's testimony was one for the jury to resolve.

Additionally, we reject appellant's argument that he is entitled to a new trial because the lower court refused to affirm the following point for charge:

Where issue is whether or not prosecutrix consented to intercourse, events leading up to the alleged rape are important in determination of whether consent was given or force was used.

It would have been proper for the lower court to give this charge to the jury.  *See Commonwealth v. Goodman*, 182 Pa.Super. 205, 126 A.2d 763 (1956).  However, reading the court's charge as a whole, as we must, *Commonwealth v. Davenport*, 462 Pa. 543, 557, 342 A.2d 67, 73 (1975); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975), we are convinced that the court's charge was adequate and did not prejudice appellant.

Given so serious a consequence—both from the prosecutor's point of view if the defendant is discharged, and from the defendant's point of view if despite what he considers insufficient evidence, he is held—it is important to achieve a proper balance between the appellate court and the jury. The court must not defer so much to the jury's verdict as to abdicate its responsibility. But neither must it intrude too far into the jury's deliberations. If this balance is to be achieved, the court must review the evidence according to the rule appropriate to the particular case. Generally stated, the cases are of three sorts.

The first sort of case is where the jury was presented with no evidence of an essential element of the offense charged. A garden variety of this sort of case is where the charge is possession of a controlled substance but there has been no evidence that the defendant possessed the substance. *See Cmwlth. v. Chenet*, 473 Pa. 181, 373 A.2d 1107 (1977); *Cmwlth. v. Wisor*, 466 Pa. 527, 353 A.2d 817 (1976). In such a case the only question the court must decide is whether, as a matter of law, proof of a certain fact—for example, possession—was essential to conviction. By deciding this question, the court in no way intrudes into the jury's deliberations. The jury could only have deliberated about the evidence presented to it. If there was no evidence that the defendant possessed the substance, the jury could hardly have discussed whether or not he did possess it. The jury's verdict therefore represents a statement that the defendant is guilty even without evidence of possession. Since that statement is wrong as a matter of law, the court abdicates its responsibility if it does not vacate the sentence and order the defendant discharged.

The second sort of case is where the jury was presented with conflicting direct evidence of a fact essential to conviction. Suppose, for example, that a witness testified that he saw the defendant with the controlled substance in his hand, but another witness testified that the defendant was somewhere else. For the appellate court to say that the evidence was insufficient to support a conviction because the jury

should have had a reasonable doubt about whether the defendant possessed the substance will almost certainly represent an unwarranted intrusion into the jury's deliberations. Since the jury saw and heard the witnesses, it was in a far better position than the appellate court to decide that the testimony of the prosecution's witness should be believed and that of the alibi witness should not be believed. To be sure, a case may be supposed where the court's sense of justice will be so offended that it will decide to intrude anyway. Consider the law school hypothetical, in which the prosecution's witness has been convicted of any number of heinous offenses, and the alibi witnesses are seven bishops. *See also Cmwlth. v. Bennett*, 224 Pa.Super. 238, 303 A.2d 220 (1973). In practice, however, the court will be so conscious of its vulnerability, because it did not see and hear the witnesses, that in the end it will almost always decide not to intrude, and despite its misgivings, will leave the case as the jury decided it. *See e. g., People v. Eisenberg*, 22 N.Y.2d 99, 291 N.Y.S.2d 318, 238 N.E.2d 719 (1968), where, over a vigorous dissent, the majority of the Court of Appeals of New York let stand a conviction supported by oral evidence that the defendant persuasively argued had been contradicted by a television tape depicting the incident at issue. This may not be so true on the civil side, where the consequence of intrusion is a new trial, at which the parties will have another chance, but it is true on the criminal side.

The third sort of case is where the fact essential to conviction was not a fact that was seen ("The defendant had it in his hand"), or heard, or otherwise physically experienced, but rather a fact the existence of which the jury had to infer. The present case is such a case. The fact in question, essential to the conviction of appellant for burglary, is whether appellant entered the victim's room with the intention to rape her. No one testified that he heard appellant say that was his intent (to the contrary, appellant testified that when he entered the victim's room, his intent was only to spend the night rather than drive home).

It is in this third sort of case that an appellate court experiences the greatest difficulty in achieving a proper balance between itself and the jury. To infer the existence of a fact is not a matter of observation ("I don't think that witness looks as though he's telling the truth") but a matter of reasoning (if A is true, then B is true). Thus, when the court asks whether the evidence is sufficient to support an inference, it finds itself comparing its powers of reasoning with the jury's and the court is likely to believe, perhaps quite unconsciously, that while its powers of observation are inferior to the jury's, its powers of reasoning are superior.

Having made this comparison, the court may go on to say that when the jury inferred that the defendant had a particular intent at a particular time, the jury was not *reasoning* from the evidence but was engaged in "surmise," or "speculation," or "conjecture," none of which is sufficient to support a conviction. *See Commonwealth v. Dolfi*, 483 Pa. 266, 396 A.2d 635 (1979); *Commonwealth v. Larkins*, 235 Pa.Super. 19, 341 A.2d 204 (1975).

To be sure, the court may be right. The point is, however, that the very nature of the case makes it easy for the court to be wrong. When the court is comparing its powers of observation with the jury's, it may easily be too deferential to the jury: (*See* the dissent in *People v. Eisenberg, supra.*) When the court is comparing its powers of reasoning with the jury's, it may easily be too self-confident.

To avoid being too self-confident, the court must remind itself that the strength of a line of reasoning depends upon the strength of the observed facts from which the reasoning proceeds. If the record contains evidence of only facts A and B, the court, after crediting the jury with powers of reasoning as strong as its own, may nevertheless feel secure in holding that an inference of intent is so tenuous as to amount to no more than surmise. More likely than not, however, the record will not be so simple but will instead contain conflicting evidence from which the jury *might have* found facts A and B, but *also* might have found facts Y and Z. Then the court must ask whether there is *some combina-*

*tion* of facts A, B, Y, and Z that *if found*, would represent a strong enough base to support an inference of intent. If there is, the court must uphold the verdict. Only if the court concludes that the jury *could not have found* a combination of facts strong enough to support an inference of intent may it hold the evidence insufficient to support the verdict.

Or, to state the rule another way: The court must ask what line of reasoning the jury might have followed to reach the inference its verdict shows it made. Then the court must ask whether the jury could have found some combination of facts to support this supposed line of reasoning. If the jury could have, the court must uphold the verdict. Only if the jury could not have, may the court hold the evidence insufficient to support the verdict.

–2–

–a–

From the evidence presented in the Commonwealth's case-in-chief the jury might have found the following facts.

Appellant and the victim were college students who sat beside each other in a psychology class. Their classroom relationship was friendly; they talked and passed notes to each other during class, and engaged in occasional sexual banter.[2] Although appellant and the victim would often walk together after class as far as the sidewalk in front of the victim's dormitory before going their separate ways, their relationship was almost exclusively limited to the classroom. They did not see each other on a social basis, and appellant was never invited (and never went) to the victim's room. This was so even though appellant had asked the victim for two dates within the two weeks immediately preceding the incident. Both times the victim declined. The second time the victim declined, appellant told here that she had "better not come to class the next day or any other day because he would get [her] for it," and that she "should

2. For example, appellant once wrote the victim, "Hey baby, do you want to take a chance, take off you underpants?" and the victim replied that she "didn't wear any that day." N.T. at 84.

wear [her] sexiest dress clothes, whatever, for [her] coffin." N.T. at 59. The victim did not take these statements so seriously that she did not go to class, nor did she protest the following day when appellant pulled her desk next to his in class. The victim did, however, decide that because of the way appellant had spoken to her, she should not continue her friendly relationship with him.[3]

On February 26, which was approximately four days after appellant's threat, at 1:00 a. m., the victim went to sleep in her dormitory room after an evening of study. At approximately 4:30 a. m. she was awakened by appellant, who was standing over her bed calling her name. She was surprised by his presence since he had not told her that he intended to come to her room. Furthermore, appellant was not authorized to be in the victim's dormitory building at that hour of the morning since he did not reside there. The dormitory was locked. Appellant had gained entry into it only by ignoring a posted notice on the door prohibiting the presence of non-residents, and by quickly following into the dormitory a resident who was returning to his room from a late-hour fraternity function.[4]

The victim asked appellant what he was doing in her room, but he did not respond. She also asked him why he did not knock before entering her room, and he replied that he had not because she would not have let him in if he had. The victim then asked appellant several times to leave, but he stayed and "just kept talking about nothing in particular, just one thing after the other, and . . . implied that he wanted to stay the night there because if he didn't, he didn't think he could make it home." N.T. at 66. Appellant also said that he "was in no condition to make it home and that if something happened to him on the way home it would be [the victim's] fault because [she] wouldn't let him stay there." *Id.* None of this, however, appeared to the

---

3. In fact, the victim testified that she did not speak to appellant at all between the time of his threat and the night of the incident.

4. Before this resident unlocked the door to enter the dormitory, appellant had attempted to jar the door open himself.

victim to state a good reason to allow appellant to stay, and she finally said, "If you don't leave, I will." N.T. at 67. Appellant "moved toward the door like he was intending to leave," *id.*, but then turned quickly towards the victim, grabbed her by the throat, and told her that she "was all right before he had asked [her] out, because  .  .  . [she] talked to him and stuff, but after he asked [her] out [she] was just like all the other girls and that he was going to teach [her] a lesson." N.T. at 68. The rape followed. Prior to the rape, appellant had given the victim no indication that he wanted sexual relations with her (unless his general request to spend the night in her room be regarded as such an indication.) Appellant started the rape "probably more than a half an hour after he arrived." N.T. at 90.

–b–

On the basis of this evidence the jury *might* have inferred that when appellant went to the victim's dormitory room, he did not intend to rape her, and that the intent to rape arose only after he was inside the room.

Such an inference would have been supported by the following facts: 1) the delay between appellant's entry into the victim's room and his assault; 2) the absence of any indication during this delay that appellant desired sexual relations with the victim; 3) the friendly relationship that had existed between appellant and the victim only a few days before the incident;  and 4) appellant's failure to conceal his identity from the dormitory resident who let him into the building.

Such an inference would have been further supported by some of appellant's own testimony. He testified that since he lived several miles from campus, he went to the victim's room primarily to avoid the drive home, and that it was only after he was inside the room that he became sexually aroused by the sight of the. victim in her bedclothes.

The question, however, is not whether the jury *might* have inferred that appellant's intent to rape arose only after appellant was inside the victim's room. The question is rather whether the jury might *also* have inferred that when

appellant went to the victim's room, he had already formed the intent to rape the victim. As discussed in the first part of this opinion, in order to test this question we must ask whether, after seeing and hearing the witnesses, the jury might have found some combination of facts that, if found, would represent a strong enough base to support its inference.

—c—

In deliberating upon the evidence, the jury might have found the following combination of facts, and on the basis of those facts, have reasoned as follows:

First: At *some* point, appellant formed the intent to rape the victim. The question is, did he form that intent *suddenly*, only after he was inside the victim's room, or had he *already* formed it before he entered the room?

Second: Appellant testified that it was only after he entered the victim's room that he became sexually aroused. That testimony, however, was inconsistent with the following evidence:

a) Within the two weeks immediately preceding the rape, the victim twice refused to have a date with appellant. Appellant deeply resented this. He threatened to "get [the victim] for it."

b) Appellant's resentment had violent sexual overtones. When the victim refused him a date the second time, appellant told her she "should wear [her] sexiest dress clothes, whatever, for [her] coffin."

c) Appellant's activities the evening before the rape suggest that he was determined to have sexual intercourse with a woman. Appellant described these activities as follows. During the evening he had dinner with a woman. After dinner he went to the campus bar, where he met another woman, whom he asked to take home. When she left with someone else, he went to the home of the first woman. When no one answered his knocking, he set out for the victim's dormitory.

This evidence at least suggests the inference that when appellant set out for the victim's dormitory, he had experienced still further rejection by women, and his determination to "get" the victim had crystallized into the determination to rape her.

Third: This suggested inference is shown to be correct by the following evidence:

a) The early hour and plainly unauthorized manner of appellant's entry into the victim's dormitory were inconsistent with a peaceful, but consistent with a violent, intent.

b) Appellant's statement to the victim that he had entered without knocking because he knew that if he had knocked, she would not have let him in, was also inconsistent with a peaceful, but consistent with a violent, intent.

c) Appellant testified that immediately upon entering the victim's room he lay down beside the victim and began to caress and fondle her. This was further evidence that before entering the victim's room, appellant had determined to have sexual intercourse with the victim.

d) As he started the rape, appellant told the victim that she "was just like all the other girls," and that "he was going to teach [her] a lesson" because she had refused to go out with him. This statement was not the statement of someone who had suddenly conceived an intent to rape. Considered with the other evidence, it was virtually an admission by appellant that he had come to the victim's room with the intent to punish—that is, to rape—her.

Of course, we cannot tell whether this was the course that the jury's deliberations took. However, it must be conceded, we believe, that the jury might have found the facts as we have just stated them. We further believe that if found, those facts represented a strong enough basis to support, beyond a reasonable doubt, an inference of appellant's intent.

The judgments of sentence are affirmed.